# MARTIN G. WEINBERG, P.C.
## ATTORNEY AT LAW

20 PARK PLAZA, SUITE 1000
BOSTON, MASSACHUSETTS 02116

(617) 227-3700

FAX (617) 338-9538

NIGHT EMERGENCY
(617) 901-3472

EMAIL ADDRESSES:

owlmgw@att.net
owlmcb@att.net

May 3, 2013

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/7/2013
```

**Via Federal Express**
Honorable Jesse M. Furman
United States District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

    Re:     **United States v. Vadim Trincher**
               **13 Cr. 268 (JMF)**

Dear Judge Furman:

    I am writing for two purposes. First, I am seeking permission to enter a limited appearance, along with co-counsel Robert M. Goldstein, to appear before Your Honor to seek the pretrial release (with suitable conditions) of Mr. Trincher. Second, I am writing to outline the grounds that, the defense respectfully submits, support an order of pretrial release, incorporating a combination of conditions that will reasonably assure the appearance of Mr. Trincher and abate any *suggested* risk of flight or danger to the community, conditions commensurate with (or exceeding) those imposed upon Mr. Trincher's co-defendant, Anatoly Golubchik, whom the government has repeatedly characterized as being in the "exact same position" as Mr. Trincher, to both Your Honor and Magistrate Judge Freeman, during bail hearings for Mr. Golubchik. Should the Court permit a limited appearance, I will forthwith file an appeal of the detention order issued by Magistrate Judge Francis on April 16, 2013, pursuant to 18 U.S.C. §3145(b), and I respectfully request a hearing on pretrial release at the Court's first opportunity.

    First, permitting this limited appearance for the purpose of applying for and litigating pretrial release issues will, in no way, depreciate from the overall objective of Mr. Trincher selecting and retaining counsel for general purposes. Both Mr. Goldstein and myself have been admitted to practice in the Commonwealth of Massachusetts, the United States District Court for the District of Massachusetts, and the First Circuit Court of Appeals, neither of us have ever been the subject of any disciplinary proceeding, we remain members in good standing in the Commonwealth of Massachusetts (Certificates

1

of Good Standing attached hereto as Exhibits 1 and 2), and would accordingly request that the Court further allow that we be permitted, pending a more formal application pursuant to Local Civil Rule 1.3(c) (made applicable by Local Criminal Rule 1.1), to appear for the purpose of filing a Notice of Appeal from Magistrate Judge Francis' prior order of detention and to appear before Your Honor to contend that the combination of conditions proposed herein more than satisfies the imperatives of the Bail Reform Act in its objective of mandating release upon a judicial determination that there exist conditions of release that would reasonably assure the appearance of the defendant and safety of the community.

As for pretrial release, Mr. Trincher is a 52 year old husband and father of three boys (ranging from age 10 through 28) with absolutely no prior involvement with any criminal justice system, no history of violating any court orders, and no history of using false identifications or engaging in obstructive conduct. Mr. Trincher immigrated to this country in 1989 to escape the communism and anti-Semitism that existed in the former Soviet Union, soon thereafter earned citizenship, and has since established deep roots in this country. He has been married to Elena for approximately 23 years, shares a close bond to their two adult sons, plays a prominent role in the growing life of his youngest son (ten years old), and offers important emotional support to his elderly mother, who is seriously ill. Over a lifetime of decent acts, he has earned the trust of many long-time friends, as evidenced by their offer to post real and personal property to secure his release, and/or to co-sign a surety bond, as detailed *infra*. While Mr. Trincher is a dual citizen of Israel, he is prepared to execute any documents necessary to consent to extradition from any country in the world. Simply put, Mr. Trincher has no intention of leaving his wife, children (two of whom are defendants in this matter), or his elderly mother. He is aware of the catastrophic consequences not only to his own family and his own future with them, but to the financial survival of family and friends who have offered to co-sign a $10 million personal assurance bond collateralized by a number of separate parcels of real estate, and would never destroy the families of those friends willing to place their financial world in his hands. To the contrary, Mr. Trincher intends to challenge the government's charges in a lawful, professional and principled manner. In short, to whatever extent the Court believes there exists any *arguendo* risk of flight or danger to the community, the defense respectfully submits that the following conditions are sufficient to secure the release of Mr. Trincher, a U.S. citizen with no criminal record, in a case that does not involve any allegations of firearms, actual physical violence, or conduct consistent with an intent to flee:[1]:

1. Home detention, within his Manhattan residence, 24 hours a day, 7 days per week, with the ability to leave the apartment only after receiving authorization from Pretrial Services for verified appointments with his defense attorneys or doctors as needed.
2. Electronic monitoring with a Global Positioning System.

---

[1] To date, the government has principally argued flight, not danger to the community, as a basis for detention, and risk of flight was the ground relied upon by Magistrate Judge Francis. In any event, Mr. Trincher addresses the issue of "danger to the community" *infra* at p.10-11, and respectfully submits that the proposed conditions would negate any risk of danger as well.

2

3. An agreement not to seek or obtain any new passport during the pendency of this matter.[2]
4. Execute an agreement consenting to extradition to the United States from any country and waiving any rights to not be extradited to the United States (defense research indicates that an Extradition Treaty exists with Israel for extortion offenses).
5. A personal recognizance bond in the amount of $10,000,000.00, or some other amount satisfactory to the Court, to be co-signed by three Financially Responsible Persons (in addition to signatures from Mr. Trincher's wife and two adult sons, as detailed below).
6. The bond shall also be supported by mortgages executed by five (5) individuals who have offered to post their real property to secure the release of Mr. Trincher, with a combined equity of over $2,000,000.00, and an additional friend who has offered to post personal property (an IRA account) valued at approximately $40,0000.00.
7. Mr. Trincher and his wife shall also pledge their personal residence in Manhattan to secure his release, which the government has estimated to be valued at $5,000,000.00 to $6,000,000.00 (and which is apparently a property that the government will seek to forfeit), as well as a second home they own in Las Vegas.
8. Mr. Trincher's wife and two oldest sons, Illya and Eugene, who are both co-defendants in this matter, have also offered to co-sign Mr. Trincher's bond.
9. Mr. Trincher shall not possess or use any computer, shall not possess or use any telephone with internet capabilities, and be permitted access to a single telephone to make only approved telephone calls.
10. The defendant will provide Pretrial Services and/or the government random access to his residence.
11. The government shall have the ability to monitor all computer activity and/or telephone calls of the defendant, including but not limited to attorney-client communications.
12. No person shall be permitted access to the residence other than the defendant, his wife, his children, and his attorneys, without prior approval of Pretrial Services and/or the Court.
13. The defendant will report daily by telephone to Pretrial Services (or any other schedule the Court deems appropriate).
14. Any other condition the Court deems necessary to reasonably assure the appearance of the defendant.

The fact that Mr. Trincher possesses dual citizenship (United States and Israel) certainly does not extinguish this Court's congressional mandate to order pretrial release in every case where reasonable conditions can assure the appearance of the defendant as required. Indeed, numerous courts have rejected government requests for detention, and instead ordered pretrial release, in cases wherein the charged defendant was either a non-

---

[2] The government has already seized Mr. Trincher's passports.

citizen or a naturalized citizen with substantial if not weightier contacts with foreign jurisdictions, including the following decisions:

- *United States v. Sabhnani*, 493 F.3d 63 (2d Cir.2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendant's "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants' possessed "ample means to finance flight", despite finding that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations");

- *United States v. Hansen*, 108 Fed.Appx. 331, 2004 WL 1888858 (6th Cir.2004) (affirming district court order of pretrial release of defendant, a resident and citizen of Denmark—from where defendant could not be extradited—charged with bulk cash smuggling and forfeiture, noting that the "bail statute does not, however, require that foreign defendants be detained simply because their return cannot be guaranteed through extradition");

- *United States v. Karni*, 298 F.Supp.2d 129 (D.D.C. 2004) (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest when he landed in Colorado for a family ski trip based on allegations he violated the Export Administration Act and the International Economic Emergency Powers Act by acquiring products capable of triggering nuclear weapons and exported them to Pakistan, despite defendant's lack of any ties to the United States, despite finding that defendant had "no ties to the United States or the Washington, D.C. area," despite finding that "no evidence [was] presented establishing that Defendant has ever lived in this country, owned property here, or that he has any family or community ties in the United States," despite finding that defendant "was only in this country in order to participate in a ski vacation with his wife and daughter," and despite finding that "the weight of the evidence against Defendant is substantial");

- *United States v. Hanson*, 613 F.Supp.2d 85 (D.D.C.2009) (Friedman, J.) (ordering release of defendant, a naturalized citizen of the United States, despite finding defendant "has strong ties to [her home country of] China," finding that the defendant owned property in China, that the defendant spent almost all of her ten

4

years of marriage living abroad with her husband, that during 2008 the defendant spent only 22 days in the United States, and that the charges against the defendant (violations of International Emergency Economic Powers Act and the Export Administration Regulations) "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items").

The backbone of each of the foregoing decisions is the fundamental principle that, in this country, there is a "strong presumption against detention." *United States v. Hanson*, 613 F.Supp.2d 85, 87 (D.D.C. 2009) (Friedman, J.). In fact, "'[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Hanson*, 613 F.Supp.2d at 87, *quoting United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). This is particularly so where, as here, the defendant has absolutely no prior criminal record.

I.     **There exists a combination of conditions that will reasonably assure Mr. Trincher's appearance in Court.**

Where the government moves for detention based on risk of flight, the government must satisfy a dual burden of proof:

> First, [the government] must establish that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court.

*Sabhnani*, 493 F.3d at 75. In other words, "[e]ven if the Court concludes the government [proves] by a preponderance of the evidence that release on personal recognizance will not reasonably assure the appearance of the defendant as required, the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that the court determines will reasonably assure the appearance of the person as required.'" *Sabhnani*, 493 F.3d at 75.[3]

Mr. Trincher respectfully submits that an analysis of the relevant statutory factors supports pretrial release; even should the Court conclude the defendant presents an actual

---

[3] *See id.* at 69, n.15 (observing that government misstated law by arguing defendant had burden of proof; "Where, as in this case, the charge against the defendant does not trigger a statutory presumption that no conditions of release can adequately assure the defendant's attendance at trial, it is the government's burden to demonstrate by a preponderance of the evidence *both* that a defendant presents a risk of flight and that no condition or combination of conditions can be imposed reasonably to assure his required attendance.") (emphasis in original).

5

risk of flight, certainly some combination of conditions exist that will reasonably assure his appearance as required. *See Hansen*, 108 Fed.Appx. at 332 ("The structure of the bail statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a 'guarantee' requirement atop the legal criterion erected to evaluate release conditions in individual cases") (*quoting United States v. Orta*, 760 F.2d 887, 892 (8th Cir.1985)).

First, the crimes with which Mr. Trincher are charged are not narcotics offenses, and largely are not crimes of violence, two factors Congress believed to be important in determining whether pretrial release is appropriate. *See* 18 U.S.C. §3142(g)(1) (nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug). The indictment does charge Mr. Trincher with participating in extortionate conduct, based on a telephone communication the government alleges constitutes a threat of violence, but to counsel's knowledge, setting aside any dispute over varying characterizations of the telephonic communication, there has been no actual act of violence identified or alleged by the government. The core of the charged scheme revolves around non-violent offenses such as gambling and money laundering, and although counsel has not heard the tape in question nor viewed any translation of the conversation, the reality is that the proposed conditions (including home arrest, limitation of access to phones and the internet, and consent to monitoring and searches) extinguish the risk that there would be any correlation between the defendant's release and any intensification of danger to any other person, including Client 2 (as identified within the indictment).

Second, the fact that the indictment alleges a significant amount of dollars at stake does not mean pretrial release is inappropriate; Congress did not impose any categorical exclusions for large-scale money laundering allegations. Congress is presumed to know existing law, and it has never amended the bail reform statute to require detention in new-age prosecutions that routinely involve allegations of large amounts of criminal proceeds. *See* 18 U.S.C. §3142 (amended in 2003 to include various crimes to be categorized as crimes of violence); *Conroy v. Aniskoff*, 507 U.S. 511, 516 & n.10, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (holding that there is a presumption that Congress is aware of the relevant case law); *Chisom v. Roemer*, 501 U.S. 380, 391, 111 S.Ct. 2354, 115 O.Ed.2d 348 (1991) (holding that if Congress had an intent to deviate from an established legal rule, "Congress would have made it explicit in the statute"). Likewise, the fact that the government seized $2 million in casino chips and $75,000 in cash from Mr. Trincher's home does not warrant detention. Mr. Trincher is a professional poker player (the government concedes they have evidence he has participated in professional poker tournaments) and casino chips and cash are the tools of that professional trade. Moreover, whether or not the chips are evidence of a professional poker player or other activities (as alleged by the government) is irrelevant to the present issue—pretrial release. The matter of import is that the chips and cash have been seized, as have Mr. Trincher's passports and other assets.

Third, the fact that the government will potentially seek a significant sentence if the defendant is convicted on all counts does not preclude pretrial release in this case—

6

several courts have ordered pretrial release despite finding that the defendant faced serious charges carrying significant potential sentences. *See, e.g., Sabhnani*, 493 F.3d 63 (2d Cir.2007) (reversing district court order of detention of defendants despite finding that defendants, natives of Indonesia, faced "lengthy term of incarceration" and "strong" evidence of guilt existed); *United States v. Karni*, 298 F.Supp.2d 129 (D.D.C. 2004) (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest, despite finding that "the weight of the evidence against Defendant is substantial"); *Hanson*, 613 F.Supp.2d 85 (D.D.C.2009) (Friedman, J.) (noting that charges "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items"). Mr. Trincher is a relatively young man (52 years old) and he would be subject to prosecution if he fled, which he now knows carries a maximum penalty of up to ten additional years of imprisonment, 18 U.S.C. §3146(b)(1)(A)(1), and/or the real risk of an enhanced sentence by the Court in this matter if not acquitted.

It must be emphasized, however, that the allegations outlined within the indictment are just that—allegations—and the defendant anticipates substantial factual and legal challenges to the government case, including but not limited to the propriety (both constitutionally and statutorily) of applying the charged statutes to gambling that apparently occurred exclusively in foreign jurisdictions, which raises serious, novel issues regarding the extraterritorial reach of American law, particularly given the Supreme Court's recent reiteration that there exists a presumption against application of American law to foreign acts, *see Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869, 2877-78 (2010) ("It is a 'longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States,'" and this canon/presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters"); *see also United States v Weingarten*, 632 F.3d 60, 64 (2d Cir. 2011), and the fact that the RICO statute was not intended to be applied extraterritorially, *see United States v Chao Fan Xu,* 706 F.3d 965, 978 (9th Cir. 2013). The government has alleged that the "customers" of Mr. Trincher's alleged <u>offshore</u> gambling enterprise were from Russia and other foreign countries. Given these threshold allegations, a RICO and §1955 prosecution appears to go one step beyond other, recent prosecutions that have criminalized extraterritorial bookmakers who, in contrast, promoted gambling by United States based bettors. In short, while the case is obviously at its infancy, and discovery has not yet been provided, there does appear to be significant factual and legal defenses to the indictment. In any event, the alleged strength of the government's case is the least important factor in the bail analysis. *See. e.g., United States v. Jee Fong Low*, 2009 WL 982115, *2 (N.D.Cal.2009) ("The second factor, the weight of the evidence, is considered the least important").

Mr. Trincher has no history of alcohol or drug abuse, no criminal history (and thus no history of violating any court orders of any nature) and suffers from no significant physical impairments. *See* 18 U.S.C. §3142(g)(3). Congress specifically

7

listed these factors as considerations for the Court, and their absence therefore should weigh in favor of Mr. Trincher's pretrial release. Mr. Trincher comes from a stable and humble family background. He escaped the former Soviet Union in 1989, where he suffered from substantial religious discrimination, and emigrated here alone. His parents soon thereafter followed. Mr. Trincher's father died in 2008; his mother is alive but is seriously ill, and she counts heavily upon Mr. Trincher for both her medical and emotional well-being. *See* Letter of Dr. Marina Ivanyuk attached hereto as Exhibit 3. Mr. Trincher has been married to his wife, Elena, since 1990, and they lived together before then in the Soviet Union (but could not be married due to then-existing anti-Semitism and political tensions). The couple has two sons—Illya (age 28) and Eugene (age 27)—and a five-month old grandson, and Mr. Trincher has a ten-year old son. His brother—his only sibling—presently resides in California with his daughter (Mr. Trincher's niece).

There is no evidence of any nature that Mr. Trincher has ever been known to use or trade in false identification or aliases. Nor will the government be able to proffer any evidence that Mr. Trincher has ever indicated any intent to flee from this investigation or any other criminal matter, which several courts have observed is a critical factor in evaluating whether pretrial release is appropriate. *See Hanson*, 613 F.Supp.2d at 90 ("In this case, like *Karni* and unlike *Anderson*, there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the United States"); *United States v. Vortis*, 785 F.2d 327 (D.C. Cir.1986) (serious intent to flee is an important factor); *United States v. Cole*, 715 F.Supp. 677, 679 (E.D.Pa.1988) (defendant told undercover agents he would flee if arrested). Indeed, during the bail hearing for Mr. Golubchik, the government conceded that it interviewed an individual during the course of its investigation who has since been charged in this case, including within a count that also charges Mr. Golubchik, whom the government has identified as being partners with Mr. Trincher. The fact that Mr. Trincher did not flee the jurisdiction with the basis to be aware of a government investigation is evidence of his intent to lawfully contest the government's charges, in a professional and principled manner.

It is important to note that there exists an extradition treaty by and between Israel and the United States, which would permit Mr. Trincher's extradition for the charged extortion offenses. Hence, Mr. Trincher understands his dual citizenship does not afford him some safe-haven from prosecution, further diminishing any *arguendo* risk of flight to another country. Some courts have focused on the absence of such extradition treaties to deny pretrial release to non-citizens or naturalized citizens with strong contacts to other countries. In any event, Mr. Trincher will voluntarily execute any waiver of any *arguendo* right to not be extradited to the United States from Israel (or any country in the world), in whatever form preferred by the government and/or Court. Lastly, Mr. Trincher is well-aware of the very long arm of this particular U.S. Attorney's Office, which has secured the arrest of individuals all over the world. *See, e.g., United States v. Bout*, Criminal No. 08-365 (SAS).[4]

---

[4] By leaving the former Soviet Union, Mr. Trincher abandoned and is no longer a citizen of Russia or the Ukraine.

Finally, to the extent there is any doubt regarding the proposed conditions, there is tremendous moral suasion provided by the posting of real and personal property of long-time family friends, and the fact that at least three family friends and Mr. Trincher's wife and two sons have offered to co-sign a surety bond, and would therefore be financially devastated should Mr. Trincher not appear in Court as required.

As the Second Circuit has observed, "'it is only a limited group of offenders who should be denied bail pending appeal." *Sabhnani*, 493 F.3d at 75, *quoting United States v. Shakur*, 817 F.2d 189, 195 (2d Cir.1987). It is well-established that the Bail Reform Act of 1984 was created to detain *only a small but identifiable group of persons*-- it "did not signal [] a Congressional intent to incarcerate wholesale the category of accused persons awaiting trial." *U.S. v. Barnett*, 986 F.Supp 385, 391 (W.D.La 1997). "Rather, Congress was concerned about a small group of individuals who could not be motivated to comply with release conditions, no matter how stringent." *Barnett*, 986 F.Supp at 391. Numerous courts have found support for these conclusions in a pertinent Senate Report:

> There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the powers to deny release pending trial. The decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. . . . It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants."

*Barnett*, 986 F.Supp at 391, *quoting* S.Rep. No. 225, 98th Cong., 1st Sess. 6-7, reprinted in 1984 U.S. Code Cong. & Admin. News at 3189-90 (footnotes omitted); *see Sabhnani*, 493 F.3d at 75 (citing S.Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 2182, 3189). The Act sets forth a number of conditions to be considered, and the "wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." *Barnett*, 986 F.Supp at 391, *quoting Orta*, 760 F.2d at 891 (8th Cir.1985).

In short, Congress envisioned the detainment of major drug traffickers, who possess "both the resources and foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences", *U.S. v. Dillon*, 938 F.2d 1412, 1416 (1st Cir.1991); Senate Report No. 98-225, 98th Congress, 2d Session at 20, reprinted in U.S. Code Cong. & Ad. News at 3203; and "who are often in the business of importing and distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, [] pose a significant risk of pretrial recidivism", *U.S. v. Shea*, 749 F.Supp. 1162, 1165-1166 (D.Mass.1990). Or, alternatively, Congress envisioned the Act's application to individuals such as Carmen Tortora, an individual with a "nasty habit of committing crimes while on parole", an individual who had sworn to kill informants, and an individual who "agreed to kill his

9

brother and desert his mother on her death bed if in the Mafia's best interests." *Tortora*, 922 F.2d at 885-886.

Simply put, Mr. Trincher does not fit the paradigm envisioned by Congress when it enacted the Bail Reform Act of 1984. He is not some international drug trafficker or violent mobster. At worst, he is alleged to have run a professional and complex gambling enterprise. Simply put, Mr. Trincher is not the type of human being that would jeopardize his ability to remain with his family, or risk the real property or personal finances of his family and friends. To the contrary, he stands committed to lawfully defending himself in this action.

## II. Hearing before, and decision by, Magistrate Judge Francis, and the issue of danger to the community.

In seeking Mr. Trincher's detention, the government will perhaps rely upon the findings of Magistrate Judge Francis, as it argued to Your Honor during the Golubchik proceeding. Prior to the original detention hearing, Mr. Trincher had limited to no communications with his counsel at the time. There were no conditions offered to Magistrate Judge Francis, and the presentation by the defense was particularly truncated, as evidenced by the transcript, attached hereto as Exhibit 4. In short, the Court was not presented with conditions such as those presented to Your Honor herein, or legal argument or precedent to support an order of release.

Additionally, the perceived deficiencies of Mr. Trincher's report to Pretrial Services should not prevent pretrial release in this matter. Mr. Trincher did not have access to counsel before or during the interview. Mr. Trincher believes he advised Pretrial Services that he had additional assets but needed to consult others to provide a detailed accounting. In any event, any *arguendo* failure to fully disclose assets should not prevent pretrial release, particularly given that Mr. Golubchik—whom the government has repeatedly described as being exactly the same as Mr. Trincher—has been released, and other defendants charged with well-known, extensive fraudulent schemes have been granted pretrial release with conditions. *See, e.g., United States v. Madoff*, Criminal No. 09-213 (DC); *United States v. Dreier*, Criminal No. 08-085 (JSR), Dkt. Entry 13.

In *Dreier*, wherein the government argued there existed an intolerable flight risk based on, *inter alia*, Dreier's "colossal criminality," the Court released Mr. Dreier on strict conditions of release despite finding that "the Government has carried its burden for the limited purposes of the bail hearing of showing that Dreier is not only a master of deceit and a doyen of dishonesty but the kind of person who, under stress, may resort to desperate measures." *Dreier*, Case No. 08-085 (JSR), Dkt. Entry 13, at 3. The Court also found sufficient conditions despite its concurrent finding that Mr. Dreier had not "been wholly candid with his counsel or the Court" in his applications for bail. *Dreier*, Case No. 08-085 (JSR), Dkt. Entry 13, at 3-4.

Lastly, while Magistrate Judge Francis relied upon the risk of flight to order

10

detention, the government has referenced perceived danger to the community, and explicitly cited it as a ground for detention before Your Honor in the Golubchik matter. In seeking pretrial detention based on alleged dangerousness to the community, the government bears the burden of proving irremediable dangerousness by clear and convincing evidence. *See* 18 U.S.C. §3142(f). In so arguing, the government has previously cited cases such as *United States v. Colombo*, 777 F.2d 96 (2d. Cir.1985), in support of its bail arguments in this case. In *Colombo*, as Your Honor noted during the Golubchik proceeding, the government proffered evidence of murder and other violent crimes. *Colombo*, 777 F.2d at 97 (noting that indictment charged defendant with committing, *inter alia*, "state and federal crimes including murder, robbery, narcotics violations, arson, extortion, threats, [and] assaults…," and at the detention hearing the government proffered that "Colombo stated that he was the head of the 'crew' and approved all criminal activity by its members," and he "directed 'crew' members to rob persons believed to be large-scale drug dealers and to distribute narcotics; that in at least two of the robberies the victims were assaulted; that Colombo approved the abduction of a supposed drug dealer, the assault of the manager of a car dealership, the extortion of a restaurant owner, and the attempted murder of a government informant; and that he was part of a conspiracy to rob passengers on an airline flight to Atlantic City"). *United States v. Barone*, 387 Fed.Appx. 88 (2d Cir.2010), likewise involved proof of Barone's "readiness to commit the charged murder-for-hire and his past commission of crimes involving or threatening violence," that at the "time of his arrest, Barone was in possession of two firearms, ammunition, a bulletproof vest, a 'how to' guide for conducting assassinations," and the government apparently possessed conversations about the planned murder for hire and "a number of past uncharged crimes, notably, his financing of a narcotics transaction, his authorization of arson, and his use of violence in furtherance of extortion."

Needless to say, these matters are critically distinguished from this case. Indeed, while the government has apparently consumed several years investigating Mr. Trincher, and has intercepted approximately 25,000 telephone communications and untold emails, the government to date can point to only a single telephone call and/or episode wherein Mr. Trincher allegedly *discussed* an extortion. Putting aside the precise statement and context, there have been no allegations of any actual violent acts by Mr. Trincher, or any allegations of access to firearms or other weapons. Without adopting the government's characterization of the conversation and/or episode, one regrettable discussion does not disqualify a U.S. citizen with no prior offenses or any history of violence or obstructionist conduct from pretrial release, and is not remotely akin to the patterns of homicidal and/or violent racketeering acts that have resulted in the detentions of other defendants in cases cited by the government. In short, the defendant respectfully submits the government cannot sustain its burden of proving, by clear and convincing evidence, that there exists a risk of danger to the community or any person exists, or that any such risk cannot be sufficiently ameliorated by the conditions proposed herein, or any other condition the Court believes appropriate.

### III. Sixth Amendment.

Finally, in a case such as this one, which will involve voluminous discovery, including what has been described as 25,000 intercepted telephone communications, which will largely be in Russian language, and has subpoenaed and presumably analyzed 360 bank accounts, it is critical to counsel's ability to provide effective assistance of counsel, as well as the defendant's ability to meaningfully contribute to his defense, that Mr. Trincher be permitted pretrial release. The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' and who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'" *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). Mr. Trincher's ability to prepare for and meaningfully contribute to his defense will be materially impaired by pretrial detention, particularly given that this case involves voluminous discovery including a substantial amount of communications in a foreign language, and that this Honorable Court has set a fixed trial date less than 14 months from now.

### IV. Conclusion.

Wherefore, for all of the foregoing reasons, Mr. Trincher respectfully submits that even if the Court concludes there exists a serious risk of flight and/or danger to the community, a combination of conditions exists that will reasonably assure his presence as required and/or the safety of the community, including but not limited to some or all of the conditions proposed *infra*, or any other conditions the Court deems necessary and appropriate.

Respectfully Submitted,

Martin G. Weinberg

cc: Joshua Naftalis and Harris Fishman
Assistant U.S. Attorneys
(via Fedex)