E4ugtrins

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4           v.                              13 CR 0268-2(JMF)

5   VADIM TRINCHER,

6               Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           April 30, 2014
9                                          11:30 a.m.

10

    Before:
11
                        HON. JESSE M. FURMAN,
12
                                           District Judge
13

14                          APPEARANCES

15

    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17   JOSHUA NAFTALIS
         Assistant United States Attorney
18
    MARTIN WEINBERG
19       Attorney for Defendant

20   ALSO PRESENT:  ANDREW TARUTZ, Russian Interpreter
                     NELLY ALISHAEV, Russian Interpreter
21                   ROBERT HANRATTY, FBI Agent

22

23

24

25

E4ugtrins

1           (Case called)

2           MR. NAFTALIS:  Josh Naftalis for the government.  With

3    me at counsel table is Robert Hanratty for the F.B.I.

4           MR. WEINBERG:  Good morning, your Honor.  Martin

5    Weinberg on behalf of Vadim Trincher, who sits to my left.

6           THE COURT:  Good morning to both of you.

7           We are joined by not one but two Russian interpreters,

8    both of whom have oaths that are on file with the clerk's

9    office.

10           I want to confirm, Mr. Trincher, that you are able to

11    understand the interpreter and there's no trouble with the

12    equipment.

13           THE DEFENDANT:  Yes.

14           THE COURT:  If at any point during this proceeding you

15    have trouble understanding, and I know you speak some English,

16    but I see that you are availing yourself of the opportunity to

17    use the services of the interpreter, just let me know and we

18    will take care of it.

19           THE DEFENDANT:  It would be better to listen in

20    Russian.

21           THE COURT:  That's fine.  I want you to let me know if

22    there's any trouble with your understanding --

23           THE DEFENDANT:  With the terminology.

24           THE COURT:  Not a problem, but do me one favor, which

25    is don't speak until I finish speaking because the court

E4ugtrins

1    reporter here has to --

2             THE DEFENDANT:  Sorry.

3             THE COURT:  You did it again.  Wait until I'm done so

4    that the court reporter can record everything that I say and

5    everything that you say and everything that happens here today.

6             Again, let me know if you have any trouble

7    understanding either in English or with the assistance of the

8    Russian interpreter, okay?

9             THE DEFENDANT:  Yes.

10            THE COURT:  Very good.

11            We are here today for purposes of sentencing.  In

12   preparation for today's proceeding, I have reviewed the

13   presentence report dated April 22, 2014.  I have also received

14   and reviewed the following additional submissions:  The

15   defendant's submissions filed April 15, 2014, as well as the

16   attachments to that submission, which include letters addressed

17   to me from the defendant's wife, sister-in-law, the mother of

18   his third child, other relatives and friends; the submission

19   filed initially on April 28 and then refiled after a filing

20   error on April 29; and the submission of the codefendant

21   Anatoly Golubchik filed April 25, 2014, which was incorporated

22   by reference in Mr. Trincher's letter of April 28.  I have also

23   received and reviewed the government's submission filed on

24   April 23, 2013.

25            Are there any additional submissions that I should

E4ugtrins

1    have received?

2                MR. NAFTALIS:  Not from the government.

3                MR. WEINBERG:  Not from the defendant.

4                THE COURT:  Very well.

5           Mr. Weinberg, have you read the presentence report?

6                MR. WEINBERG:  I have read the presentence report, as

7    has Mr. Trincher.

8                THE COURT:  Have you discussed it with Mr. Trincher?

9                MR. WEINBERG:  We have discussed the presentence

10   report, your Honor.

11               THE COURT:  Putting aside the calculation of the

12   sentencing guidelines for a moment, are there any objections to

13   the report with respect to its factual accuracy?

14               MR. WEINBERG:  There is just one objection that I

15   discussed with Mr. Naftalis and with Mr. Fischman before him.

16   The objection is to the last sentence in paragraph 34 where the

17   probation officer mistakenly represents the government's

18   position on the amount of laundered funds to be 150 million,

19   when, in fact, the government's position, as your Honor knows,

20   it's 100.  The government has agreed with my objection and we

21   ask that the probation report be amended.

22               THE COURT:  I actually was wondering about that myself

23   as that was the first time I had seen reference to 150 million,

24   which also is repeated in the probation department's

25   recommendation portion of the presentence report.

E4ugtrins

1          Mr. Naftalis, is there any objection to making that

2     change?

3          MR. NAFTALIS:  No, your Honor.  That's correct.

4          THE COURT:  I will direct that the last sentence of

5     paragraph 34 and the recommendation be changed from 150 million

6     to $100 million.

7          Mr. Trincher, have you reviewed or read the

8     presentence report?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Did you do so in English or was it

11    translated for you into Russian?

12         THE DEFENDANT:  English.

13         THE COURT:  Were you able to understand it in English?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Did you discuss it with Mr. Weinberg?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Did you have enough time to go over it

18    with Mr. Weinberg --

19         THE DEFENDANT:  Yes, I did so.

20         THE COURT:  You have to wait for me to finish,

21    remember.

22         Did you have enough time to go over with him any

23    mistakes in the report or anything that you wish to bring to my

24    attention today?

25         THE DEFENDANT:  No.

E4ugtrins

```
 1              THE COURT:  Did you have enough time to discuss those
 2    things with him?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Mr. Naftalis, have you reviewed the
 5    presentence report?
 6              MR. NAFTALIS:  Yes, your Honor.
 7              THE COURT:  Putting aside the sentencing guidelines
 8    for a moment, again, are there any objections, beyond the
 9    correction we have already made, to the factual accuracy of the
10    report?
11              MR. NAFTALIS:  No, your Honor.
12              THE COURT:  Hearing no objections, other than the one
13    that was made and the change I have already directed, I will
14    otherwise adopt the factual recitations set forth in the
15    presentence report which will be made a part of the record in
16    this matter and placed under seal.
17              If an appeal is taken, counsel on appeal may have
18    access to the sealed report without further application to the
19    Court.
20              As counsel are aware, I am no longer required to
21    follow the United States Sentencing Guidelines, but I am
22    required to consider the applicable guidelines range in
23    imposing sentence and must therefore accurately calculate the
24    sentencing guidelines range.
25              In this case, there was a plea agreement in which the
```

E4ugtrins

parties stipulated to a particular calculation of the

sentencing guidelines.  I take it that the sentencing

guidelines range calculated by the probation department is the

same as the range to which the parties agreed in that

agreement.

        Is that correct, Mr. Weinberg?

        MR. WEINBERG:  Yes, it is, your Honor.

        THE COURT:  Mr. Naftalis.

        MR. NAFTALIS:  Yes, your Honor.

        THE COURT:  That agreement notwithstanding, I directed

the parties, in an order on Monday, to be prepared to address

the question of whether an aggravating role enhancement was

warranted pursuant to Section 3B1.1 of the guidelines.

        As Mr. Weinberg certainly knows, this was an issue

that was discussed at some length yesterday at the sentencing

of Mr. Golubchik.

        As I indicated yesterday, I was frankly a little

puzzled by the absence of the enhancement in the plea agreement

and in the probation report.  Again, as with Mr. Golubchik, it

would appear to me to apply on its face; that is to say, there

does not seem to be any real dispute that Mr. Trincher was a

leader or organizer in this case, and that is stated expressly

in paragraph 34 of the presentence report.  It does not seem

there could be any real dispute that there are at least five

participants in that criminal activity or that it was otherwise

E4ugtrins

1    extensive within the meaning of the guidelines' provision.

2          Mr. Naftalis, I assume you take the same position you

3    took yesterday, which is that you're not seeking the

4    enhancement, but you do not deny that it could be applied.

5          MR. NAFTALIS:  Yes, your Honor.

6          THE COURT:  Mr. Weinberg, do you wish to be heard on

7    this?

8          MR. WEINBERG:  Very briefly.  I don't intend to reecho

9    yesterday's arguments.  I would, however, want to adopt the

10   argument regarding the government's breach of the spirit of the

11   agreement.

12         I would want to ask the Court to consider a slight

13   derivative of the role argument and I'll do it very briefly,

14   which is that unlike Mr. Golubchik, Mr. Trincher had a

15   leadership role, or like Mr. Golubchik, Mr. Trincher had a

16   leadership role in the gambling portion of the R.I.C.O.

17   enterprise.  He deferred to Mr. Golubchik, who was not a

18   supervisor or organizer, although he was a beneficiary of the

19   monies that came from Russia, the Ukraine, to Cyprus and,

20   thereafter, to the United States, that part of the money

21   laundering.

22         I'm not contending he's not liable for that predicate.

23   He pled to that predicate.  He's guilty of it.  He profited

24   from it.

25         I'm not making a distinction regarding their receipt

E4ugtrins

1    of revenues.  But in terms of supervision, in terms of active

2    involvement in the money laundering aspect, the indictment is,

3    as well as the government's position at the Golubchik bail

4    hearing, demonstrates that there's some separation between the

5    two.  The role issue comes down to role as required to be

6    assessed by the R.I.C.O. enterprise, not by its predicates.

7            Whether or not a leadership role in the bookmaking

8    predicate would constitute a leadership role in R.I.C.O. is a

9    decision for the Court; secondly, I would want to preserve, and

10   although I know your Honor rejected it yesterday, the

11   extraterritoriality comes into play only here.

12           We have a hybrid enterprise.  It, obviously, has a

13   United States component.  Mr. Trincher pled to it.  He's not in

14   any way challenging that plea.  He's guilty.  *Morrison* doesn't

15   apply to the factual basis that there was a United States nexus

16   to the enterprise.

17           But as to his supervision, his management, his

18   organization, it was not of Americans.  It was of Ukrainians.

19   Ukrainian bookmakers are clearly involved with the leadership

20   role, and I would not challenge the factual predicate for it.

21           The circuit has said foreign crimes are not relevant

22   conduct.  *Vilar* says a purely foreign offense cannot raise the

23   value.  The Court has not dealt with leadership of foreign

24   parties in a hybrid enterprise for role.

25           The only argument I'd make is that the role adjustment

E4ugtrins

1    requires that your Honor find that they were criminal

2    participants.  Purely foreign conduct is not a criminal

3    participation.

4         It's up to your Honor to decide in this overarching

5    R.I.C.O. where there's an American nexus whether a Ukrainian

6    bookmaker who never came to the America, who never took a

7    United States' bet, but who he clearly supervised – I don't

8    deny that part, and I don't deny the extensiveness of the five

9    or more parties aspect, but I just want to preserve the issue

10   because I think this whole application of *Morrison* in

11   sentencing through *Vilar* and other cases is in the less

12   certain/unknown territory, and that would be my argument.

13        He's had leadership and bookmaking.  Bookmaking is

14   part of the R.I.C.O.  Whether he's a leader of the R.I.C.O. is

15   your Honor's determination based on that argument.

16        THE COURT:  As you know, yesterday Mr. Naftalis argued

17   that there are at least five participants here domestically and

18   identified, among others, some codefendants in this case.

19        Do you dispute that they would qualify as participants

20   for purposes of the enhancement?

21        MR. WEINBERG:  No, but I would quarrel with the

22   proposition that he had a supervisory, management role of

23   Mr. Greenberg, Mr. Sall, and any of the people who were

24   involved in the money laundering side of the case.

25        In fact, the indictment, when it describes

E4ugtrins

1    Mr. Golubchik versus Mr. Trincher, it says that Mr. Trincher

2    was a leader of the bookmaking; and it then says Mr. Golubchik

3    was a leader of the bookmaking.  And it adds as to

4    Mr. Golubchik, and this is in paragraph nine of the indictment,

5    that Mr. Golubchik worked with Trincher to oversee the sports

6    gambling, directed members of the associates in the

7    organization in laundering tens of millions of dollars, a

8    representation that properly was not made as to Mr. Trincher.

9            During the bail hearing before your Honor, the

10   government, Mr. Naftalis, represented correctly that Golubchik,

11   quote, on page 17, "actually has more access to money than

12   Mr. Trincher.  Mr. Golubchik was more of a money launderer."

13           I represent, through the reading of the extensive line

14   sheets and summaries of the Russian conversations, he deferred

15   to Mr. Golubchik when it came to money issues, investment

16   issues, banking issues, laundering issues.

17           He's guilty of the R.I.C.O.  He's guilty of

18   supervising the bookmakers in the Ukraine.  There's certainly

19   five or more people, but he didn't supervise Greenberg or Sall

20   or any of the people who were involved in the investment of the

21   money end.

22           THE COURT:  Let me say at the outset, to the extent

23   that you incorporated by reference the arguments made yesterday

24   about breach, I incorporate by reference my ruling on those.  I

25   think they are without merit and, therefore, I'm not persuaded

E4ugtrins

1    on that score.

2            Mr. Naftalis, do you want to be heard or briefly

3    respond to Mr. Weinberg with respect to, in particular, the

4    distinctions, if any, to be drawn between Mr. Trincher and

5    Mr. Golubchik and whether he would qualify as a leader of the

6    enterprise or at large?

7            MR. NAFTALIS:  Yes.  We incorporate what we said

8    yesterday, including that we are not seeking the leadership

9    enhancement.

10           What I hear is in contention with what Mr. Lichtman

11   said yesterday.  Mr. Lichtman said everything is abroad and I'm

12   the money launderer; and Mr. Weinberg is saying I'm the

13   gambling guy and everything is abroad.  So, it seems everything

14   is abroad.  In any event, they waived this.

15           I'm sitting here thinking I should be arguing someone

16   breached because all of these issues that were waived are now

17   coming up again.  We're not taking that position, but I'm

18   putting that aside.

19           THE COURT:  I don't think they waived the issue of

20   whether the enhancement applies.  That's an issue I have

21   raised, and Mr. Weinberg is making arguments that I think are

22   properly made with respect to whether that enhancement should

23   be applied.

24           My question to you is on the factual question.

25           MR. NAFTALIS:  On the factual question.

E4ugtrins

1            THE COURT:  Yes, on the factual question of

2     Mr. Trincher's leadership role, if any, or managerial role, if

3     any, with respect to the different components of the enterprise

4     here and where the participants in that conduct were located.

5            MR. NAFTALIS:  I think it is fair to say that to the

6     extent one of them had more of a money laundering role, it was

7     Mr. Golubchik.  Mr. Trincher, though, was setting all the lines

8     and involved in the money laundering.  They may have had

9     different strengths, but I don't think that means one of them

10    is less of a leader.  There were certainly five domestic

11    participants.

12           I'm honestly not sure whether you can strip out a

13    predicate and argue that you're a leader with respect to one of

14    the predicates.  I think you're the leader with respect to

15    R.I.C.O. and we should probably lump them.  I'm shooting from

16    the hip honestly, but it doesn't make sense to me that you can

17    make *Morrison* arguments with respect to predicates when they

18    have pled to domestic conduct anyway.

19           Putting that aside, I do accept the proposition that

20    Mr. Golubchik was more of the money launderer than

21    Mr. Trincher, but they both were doing the exact same thing.

22    Maybe one of them set the lines more, being Mr. Trincher,

23    but he's doing all of that here.  To the extent that your Honor

24    recognized yesterday there's a lot of money laundering abroad,

25    this is why I think this argument falls apart, because they're

E4ugtrins

1     arguing against each other.

2                THE COURT:  Are there five or more participants in the

3     gambling piece of it in the United States, as well?  Yesterday

4     you mentioned Mr. Sall and Mr. Druzhinsky and the like.  At

5     least I think both of them, if I recall correctly, are more on

6     the money laundering side of it.

7                Would you identify five or more on the gambling side

8     of it to the extent that's even an intelligible distinction to

9     draw?

10               MR. NAFTALIS:  I don't think you can really draw the

11    distinction.  It's nice to argue it academically that they're

12    separate, but obviously they overlap, which is why we went into

13    this court, because if you're laundering your own proceeds,

14    we're chasing our tail.  There isn't sort of the money launders

15    per se.  The money launderers are supporting the gambling

16    business, which is why we're in this guidelines problem.

17               There are certainly domestic participants here,

18    including Sall Greenberg, Mr. Trincher, Mr. Trincher's son,

19    Illya, Mr. Katchaloff, Mr. Druzhinsky, Mr. Shteyngrob.

20    Mr. Druzhinsky's organization overlaps with this enterprise.

21    The fact they aren't in the R.I.C.O. enterprise doesn't mean

22    they wouldn't be counted for purposes of this five-person

23    counting.  I do think it's a distinction without a difference,

24    but we easily meet it on both ends.

25               THE COURT:  I do find that the leadership enhancement

E4ugtrins

applies under 3B1.1(a) and incorporate by reference my ruling

on that score yesterday.  The bottom line is that I think it's

undisputed that Mr. Trincher was indeed a leader or organizer

of criminal activity, at least as to part of the enterprise's

activity.  I think, too, it is ultimately impossible to

disentangle the two in the sense that the money laundering was

laundering the gambling proceeds and the gambling was furthered

by the money laundering and vice versa.  In that regard, I

don't think there's a meaningful distinction to be drawn for

purposes of whether somebody qualifies as a leader or manager.

The law is you can be a leader or a manager of a portion of an

enterprise in any event.

        I also find without merit, for the reasons that I

stated yesterday, any reliance or argument based on *Morrison* or

*Vilar* here.  To begin with, as a matter of law, I find it hard

to imagine that the enhancement would not apply to someone who

conducted their criminal activity from the United States and

supervised people outside the United States in the sense that

those people would be participants in criminal activity, the

criminal activity to which someone pled.  And the fact that

they are physically located outside of the United States does

not put them beyond the scope of this particular provision.  It

was cited as an example yesterday a drug conspiracy that occurs

outside of the United States altogether with respect to drugs

being sent into the United States.

E4ugtrins

1          Beyond that, I think the record here would support a

2     finding that there were five or more participants, regardless;

3     and regardless, that the criminal activity was quote/unquote

4     otherwise extensive given the massive scope, scale and nature

5     of the criminal activity at issue here.

6          The bottom line is, it's not a close call and the

7     enhancement clearly does apply; and to the extent that

8     Mr. Weinberg has arguments to the contrary, perhaps you can

9     make those to the circuit depending on what my sentence

10    ultimately is.

11         In light of that, and the parties' agreement as to the

12    rest of the guidelines calculation and the absence of any

13    objection as to the rest of the calculation, as well as my own

14    independent evaluation of the guidelines, I find, using the

15    November 2013 edition of the sentencing guidelines that the

16    total offense level is 20, the Criminal History Category is I,

17    the guidelines range is 33- to 41 months' imprisonment, and the

18    fine range is 7500- to $75,000.

19         Let's turn to the issue of departures.  In the plea

20    agreement, the parties agreed not to seek a departure from the

21    guidelines range, either an upward or a downward departure.

22         Is that correct, Mr. Naftalis?

23         MR. NAFTALIS:  Yes.

24         THE COURT:  Mr. Weinberg.

25         MR. WEINBERG:  Yes, your Honor.

E4ugtrins

1          THE COURT:  That agreement notwithstanding, I issued

2     an order yesterday indicating that counsel should be prepared

3     to address the question of whether the government's argument

4     for an upward variance on the grounds that the guidelines do

5     not adequately take into consideration the offense conduct

6     would be a basis for an upward departure pursuant to Section

7     5K2.0 of the guidelines; that is on the ground that this case

8     presents circumstances of a kind or to a degree not adequately

9     taken into consideration by the guidelines.

10          As I indicated yesterday at the sentencing of

11     Mr. Golubchik, the issue may ultimately be academic, but under

12     *Crosby* and its progeny, the question of a departure is supposed

13     to be treated as analytically and legally distinct from the

14     question of a variance and is supposed to be addressed first,

15     so that is what prompted me to raise the issue.

16          Let me ask at the outset, Mr. Weinberg.  Obviously, as

17     I indicated yesterday, the parties are entitled to notice

18     before the Court contemplates or imposes any departure and that

19     is reasonable notice, I think particularly because this

20     sentencing is taking place a day later and you were present

21     yesterday and the issue is fully joined in the parties'

22     sentencing submissions, even if it was addressed and

23     articulated there as a variance issue rather than a departure

24     issue that you have gotten reasonable notice, but I want to

25     confirm that you have read it.

E4ugtrins

1          MR. WEINBERG:  I have read it.

2          THE COURT:  Very good.

3          What I propose to do is what I did yesterday, which is

4     to defer the question of the departure on that ground until

5     after I hear from counsel more generally on the theory that

6     your sentencing remarks may address the issue more broadly

7     whether it is treated or viewed as an issue of a departure or

8     an issue of a variance.  I'm going to table that issue for a

9     moment.

10          Putting that one issue aside, I have nevertheless

11     reviewed whether there would be another basis for a departure

12     within the guidelines' framework; that is, as distinct from

13     what has come to be known as a variance.  And I do not think

14     that there are grounds that would support a departure in either

15     direction.

16          Having settled all that, or at least most of that,

17     Mr. Naftalis, do you wish to be heard with respect to

18     sentencing?

19          Let me ask both counsel, obviously, both of you were

20     present yesterday for the lengthy sentencing proceedings with

21     respect to Mr. Golubchik.  Obviously, Mr. Weinberg, you're

22     entitled to make any arguments you want, even if they repeat

23     arguments that I heard and ruled upon yesterday.  But what

24     might be most helpful to me is, to the extent that you think

25     that Mr. Trincher is either similarly situated or different

E4ugtrins

1    from Mr. Golubchik, to certainly address that because,

2    obviously, that is going to be a factor in my decision of what

3    sentence to impose on Mr. Trincher.

4            With that introduction, Mr. Naftalis, is there

5    anything you wish to say?

6            MR. NAFTALIS:  We don't have anything else to add,

7    other than to point out, as we did, that to the extent there is

8    a distinction, I would say as a threshold matter, I don't think

9    there's a distinction between Mr. Golubchik and Mr. Trincher

10   with respect to what they did.  If you're going to call one

11   more of a money launderer versus a gambler, I think they're

12   basically at the same level.

13           To the extent there's a distinction, it's that

14   Mr. Trincher also brought his sons into the gambling business.

15   I don't think it necessarily means the sentence should be

16   different honestly, but we wanted to point out that both Illya

17   and Eugene Trincher have been convicted for gambling-related

18   offenses.  It certainly speaks of the defendant's involvement

19   in this business that he managed to pull his sons into it and,

20   in our view, he was grooming them to take his role.  The

21   gambling business that Illya Trincher was running, it was

22   basically a baby version of what Mr. Vadim Trincher was

23   running.  In the years to come, we expected that's what would

24   have happened.

25           THE COURT:  Thank you.

E4ugtrins

1          Mr. Weinberg, do you wish to be heard?

2          MR. WEINBERG:  I do.  May I speak from the podium?

3          THE COURT:  Sure.

4          MR. WEINBERG:  Thank you, sir.

5          I don't intend to reecho the arguments of yesterday.

6   I intend instead, if your Honor please, to make either new ones

7   or to augment an argument that I don't know was sufficiently

8   presented.

9          I also want to do it in the context where I think the

10  government and I agree that Mr. Golubchik was the engineer, the

11  quarterback, the force in terms of money laundering, and,

12  therefore, to the extent your Honor separates out bookmaking

13  and money laundering, I think there is a principal distinction

14  between the application of an upward departure/variance.  If I

15  use one term or another, I mean to present an argument that

16  addresses both of those separate but related concepts and

17  whether or not the guideline of 33 to 41 months ought to move

18  upwards towards the 60 months.

19         Your Honor can consider the fact that Mr. Trincher

20  deferred to Mr. Golubchik on matters of business, investments,

21  banking, moving money, investing money, selecting businesses,

22  supervising businesses.  Mr. Trincher is a man, and this is not

23  offered as an excuse in any way, who grew up in Kiev.  He was

24  denied an adequate education.

25         At age 28, he was able to emigrate to the United

E4ugtrins

1   States, bring his family with him, but didn't have the skills

2   to be an American businessman.  He had the brain but didn't

3   have the education, didn't have the skills.  And what he did

4   was he stayed in touch with his early friends from Kiev, that

5   he made a living for his family that had lost their business

6   because they were trying to emigrate and they were denied the

7   right to work in the old Soviet Union.

8          He made a living through the ten years after school

9   through being a very successful card and backgammon player.  He

10  came to the United States.  During those ten years, he met many

11  of the people that became, when Gorbachev liberated the Ukraine

12  from the Soviet Union, the people that became an oligarchs, the

13  millionaires, the billionaires, the people who essentially made

14  mega wealth through the ways that people in Russia and the

15  Ukraine made that kind of wealth.  They were his bettors.  They

16  were his clients.

17         He never had a United States bettor.  He never made a

18  dollar himself personally.  He never received bets from the

19  United States customers.  There's a couple of satellite bettors

20  that bet with Mr. Golubchik that he profited from indirectly

21  because they had a partnership in business.

22         But his clientele, and the reason that this

23  organization made so much money, were the owners of soccer

24  teams in Kiev.  They were the owners of apartment complexes in

25  Moscow.  They were these enormously wealthy people that were

E4ugtrins

1  placing recreational bets in large amounts which was the

2  corollary of the bookmaker who won more than he lost making a

3  lot of money.  But once the money was made, the money was

4  really owned and controlled and directed and engineered by

5  Mr. Golubchik who had a far greater interest in facility and

6  the operations of businesses and investments.

7      With that said, I think there are three or four

8  principal bases where your Honor can either reconsider the

9  application or consider whether or not an upward departure or

10  an upward variation is needed for Mr. Trincher.  It's an

11  individualized sentence, and I think there is a distinction on

12  the money laundering front that can justify a sentence

13  different than that imposed yesterday.

14      First, let me, if I can, spend a few minutes setting

15  out the objection that I would have made yesterday on an even

16  playing field on the 5K2/3553.  The first would be more of a

17  legal objection that this is not a factor that the commission

18  did not consider.  And that doesn't eliminate it under 3553,

19  but I suggest it raises the burden for an upward departure to

20  find exceptional circumstances, rather than just circumstances

21  not considered by the commission.

22      What we have here is 27 straight years since the

23  formation of the commission, which was formulated to create

24  national uniformity, of a base offense level 12 with no

25  specific enhancements to the underlying specified unlawful

E4ugtrins

1    activity, that being bookmaking.

2            The Department of Justice knows how to ask for changes

3    in the sentencing commission.  They're a very forceful advocate

4    for changes.  The sentencing commission has amended the

5    guidelines over 700 times.  There has never been, to my

6    knowledge, a demand or a request or a push from the Department

7    of Justice to change the base offense level 12.  I don't know

8    of any other judge that has upwardly departed for bookmaking

9    alone.

10           Again, this is a R.I.C.O. case and a money laundering

11   case, so there are certain differences, but it's not as if

12   there's a ground swell of judicial challenge to the base

13   offense level 12 like there is, for instance, with child

14   pornography guidelines or for drug guidelines or even for fraud

15   guidelines for the lesser involved people where judges have

16   regularly departed downward and registered their

17   dissatisfaction with the architecture of the guidelines.

18           Money laundering is parallel to the bookmaking

19   guideline where you have in 2001 a very deliberate decision

20   made by the sentencing commission where there are judges on the

21   sentencing commission, the most recent judge is the chief judge

22   of my local court, Judge Saris from the District of

23   Massachusetts.

24           They do hear when there are problems.  They listen to

25   the Department of Justice.  They listen to the defense bar.

E4ugtrins

1   And yet since 2001, nobody has really challenged the idea that

2   the direct money laundering guideline, which correlates to the

3   underlying offense and increases the guideline for drug dealers

4   and for major fraud people through the quantity of drugs,

5   through the value, that there is no enhancement for bookmaking.

6   That was a deliberate decision.  Never challenged by the

7   government, never challenged by the sentencing commission.

8        So what does that mean?  Well, ignorance of the law is

9   no defense.  There ought to be some value in the fact that

10  predictability and uniformity and knowledge of the law – even

11  if it's constructive knowledge, because citizens clearly can't

12  master the complexities of Title 18 of the sentencing

13  guidelines – that a citizen would expect.

14       Forget the plea agreement.  They would expect the

15  guidelines are the guidelines and the courts do have the

16  authority to go up or go down.  It's not strictly *ex post*

17  *facto*.  We're dealing with whether the guidelines should be

18  changed for a significant bookmaking operation that generates

19  sufficient money, but there are some of those values of

20  consistency and on predictability that do get destabilized when

21  the government is seeking and the Court independently – I

22  understand this is the Court's job – to independently judge

23  under 3553 and 5K2 whether there is a factor the commission

24  didn't consider.

25       I would first make the legal argument that the

E4ugtrins

commission did consider bookmaking.  Bookmaking makes money.  I
gave your Honor a footnote on page four of the original
sentencing brief, I quoted from the article of "The New York
Times" where they talked about what an incredible amount of
money is bet each year.

THE COURT:  I remember the article.

MR. WEINBERG:  Billions and billions, into the
hundreds of billions of dollars are lost by sports bettors in
America.  He didn't make one of those dollars or if he made
one, he made very little.  The government has consistently and
properly represented in the affidavits they catered to Russian
and Ukrainian bettors.  Maybe there's a small percentage that
Mr. Golubchik took from U.S. bettors.  But the thrust of it was
they didn't even enter into this mega-billion-dollar business,
but other bookmakers have.  This is where I challenge the
government that there's no factual basis for the government's
position that this is some exceptional, extraordinary
bookmaking operation.

Yes, there's a lot of money.  And as someone who comes
from my background, it's a lot of money, whether it's one-third
of 50 million or one-half of 50, whatever it is, it's a lot of
money.  But in bookmaking, it's not huge, out of heartland
extraordinary.

Yesterday, you asked a hypothetical that wasn't
answered.  Clearly, there's two anomalies here:  What do we do

E4ugtrins

with Mr. Azen whose guidelines are higher than Mr. Trinchers'?
What do we do about the bookmaker who wasn't indicted here who
makes 2,000 bucks on a street corner and how do we compare
that?

First, the commission decided that there is no value;
but second, there are ways to address those two anomalies.
Your Honor addressed it with Mr. Azen.  Had it not been for his
violence, I'm not the Judge, obviously, I can't testify to the
assessment, but your Honor did say there is a pattern of
violence, a reputation for violence with Mr. Azen.  People went
to him to collect.  His guideline was 18, his sentence was 18,
but it may well have been less with your Honor's deciding how
do I temper, moderate what is an extreme third-party money
launder in the guidelines?

Judges do that in fraud cases where people are
involved in a large fraud, but they're at the very bottom and
judges consistently individualize the sentence.  There is a
principled way to bridge the two people through a downward
departure.

I would suggest for a $2,000 bookmaker, first, he
wouldn't be federally indicted.  He would be state-indicted.
He would not end up with a jail sentence.  Bookmakers regularly
get probation.  The Pinnacle defendants got probation in
Queens.

Bookmaking, whatever we think of it, whatever its

E4ugtrins

1    effect, has not resulted in large jail sentences.  And I would

2    represent to your Honor that I did a quick survey, including

3    asking Mr. Chesnoff, who knows bookmaking cases like New York

4    lawyers know insider trading cases.

5        In the *Jay Cohen* case, the leading Second Circuit

6    precedent, it's a much larger case.  In that case, he received

7    a 21-month sentence, I'll check my notes, but it was in the

8    twenties.  He went to trial and lost.  His codefendant got a

9    nonjail sentence from Judge Wood.

10       Mr. Gorean in Florida fell all over the wiretap

11   applications, a major bookmaker, Northern District of New York.

12   He was denied bail, he did a year in jail, major money

13   laundering.  He got money laundering plus four for the specific

14   offense, down three.  He got time served, one year.

15       The biggest bookmaker, a billion-dollar bookmaker

16   named Kaplan who got arrested and convicted, he got 51 months,

17   and that was Bet On Sports, B.O.S., a billion-dollar bookmaker.

18       I would submit that these internet bookmaking

19   companies, like the poker companies that Judge Kaplan

20   addressed, make hundreds and hundreds of millions, that they

21   take American bets, that they make money from American bettors,

22   that they're within the heartland of why the federal government

23   federally criminalized bookmaking, which is to protect United

24   States citizens, not to protect some Ukrainian oligarch.

25       I would, therefore, make the two principal arguments

E4ugtrins

that, one, the commission has considered the amount of money

that a bookmaker makes.  They have considered its longevity,

its scope, its profits, its proceeds.  It has concluded that

that is not a factor.  That is a factor the commission

considered and not a factor that they want to use, unlike in

other crimes; secondly, despite the fraction, whether it's a

half or a third of the money, whether it's 50 or 100, sadly,

perhaps, this is not an exceptionally large bookmaking

operation.

        To the extent it's sizeable, the atypicality, I would

suggest, cuts against aggravation because it's not the New York

bettor.  It's not the small bettor.  In Cohen they talked about

1600 Americans bet through Jay Cohen's operation ten years ago

out of 16,000 bettors in all.

        He had 15.  Most of them were his friends.  All of

them could afford to lose money.

        I would recommend to the Court to consider as to

Trincher whose conduct, to the extent it's aggravated, it's as

a bookmaker, not a money launderer, that your Honor reject the

government's request for an upward departure.

        I would also contend, your Honor, that as a

proportionality matter, I don't want to, again, burden the

Druzhinsky sentencing.  The guideline sentence of 33 to 41

months would be a multiple of ten or 11 or 12 or 13 more than

the jail portion of Mr. Druzhinsky's sentence; that although

E4ugtrins

1    his money laundering was four million, not X million, even when

2    the commission deals with money, they don't double the sentence

3    for each doubling of the money.

4         For instance, when you go from one million to 2.5

5    million in the 2B1.1 table, it goes up two levels from 14.  It

6    doesn't go from 14 to 28.  So, the commission understands the

7    gravity of the sentence cannot simply be a multiple of the

8    amount of money.

9         I would submit with Mr. Druzhinsky, he took American

10   bets.  He wanted some of Mr. Golubchik's clients according to

11   the evidence, that he was a bookmaker and money launderer, and

12   that Mr. Trincher's conduct is not ten or 12 times graver or

13   requiring a sentence of ten or 12 times, which would be the

14   guideline, and certainly not 20 times as serious in terms of

15   the rationales for sentencing, which is to deter.  Yesterday's

16   sentence would deter anyone.  And sentences of short, discreet

17   consistency, it's always been taught that that deters people

18   who are deterrable.

19        Punishment, whether it's three years, Judge, anything

20   over what he negotiated to is serious punishment.  I would ask

21   the Court on a proportionality ground -- I understand the Court

22   wants to position defendants in a multiple-defendant case, it's

23   perfectly appropriate to deal with disparity and

24   proportionality, but to multiply his sentence 20 times is

25   unwarranted disparity, and that would be the result if your

E4ugtrins

Honor imposed the 60-month sentence on Mr. Trincher.

I would also ask the Court to remember, as I have
said, that his bettors were not U.S. bettors. I think he,
therefore, falls outside of the heartland in a way that is
inconsistent with magnifying his punishment more than someone
who took bets from a United States bettor. It doesn't excuse
it. Certainly, the money came into the U.S. and he used the
phones. Had he used the phones in Moscow, this would be a
licensing issue, not a R.I.C.O. issue. It doesn't excuse it.
It doesn't explain it. He's guilty. He admits it.

I want to focus, if I can, because I don't know if the
government is still pushing the Marik call. I hope they're
not. I think I shared the total records that these are best
friends kidding, and if the Court does not want me to address
that, I won't.

THE COURT: Unless the government does want to press
the point, then I'm persuaded by your arguments that that is
probably more innocuous than the government suggested
initially. So I don't think you need to spend any time on
that.

MR. WEINBERG: I do, however, want to address, I don't
know how to pronounce his name, so I'll say Tokhtakhounov. The
probation report represents what it represents. At the time, I
didn't object. I didn't think it was material, given my
understanding that the government was going to recommend a

E4ugtrins

guidelines sentence, but the facts are as follows:

The government wiretapped Mr. Trincher and
Mr. Golubchik for five months.  That was two years ago.  There
has not been any evidence presented to the Court in terms of
any suggestion that the sentence should be effected or enhanced
for violence.  There's been no evidence that anyone was harmed.
There's been no evidence that any identifiable bettor was
threatened.  There's certainly no evidence on these tapes that
Mr. Trincher threatened anybody.

He's a businessman.  The tapes are replete with him
saying give it time, he'll pay, he'll pay slowly.  He'll pay by
the month.  He never asked Tokhtakhounov, go get my money and
threaten people, implicitly or explicitly.  I can't speak for
what happens in Moscow.

I can speak to, that after studying this case and many
months of call sheets, there's no evidence that he threatened
anybody or asked for anyone to threaten anyone or asked for
anyone to go collect money through use of extortionate means,
and the government didn't ask him to plead to an extortionate
predicate.  Thousands of wiretaps two years ago is not a
trustworthy basis to enhance his sentence on violence.

Going to these two conversations with Mr. Golubchik,
not with Mr. Trincher, but to the extent that it spills over, I
can't ignore the effect.  The first of the two, they were
discussing a bettor named Tatarin.  He is recommended to them

E4ugtrins

by Mr. Tokhtakhounov as someone who made 50 million bucks and
wanted to bet, and that he, Tokhtakhounov, would say I think
it's a good bet to take.  He left it up to Mr. Trincher and
Mr. Golubchik, and they ended up not taking him as a bettor.

        Through the continuation of the wiretaps, it would
reflect he was not betting with them in late May and June of
2012.  They said no, which I think is consistent with the fact
that they didn't want a bettor who caused problems, who
complained, who would be a problem.  They didn't want to rely
on any kind of improper collection.

        Part of what the government reads in, and none of us
were there in Moscow and we're not on the streets and we're
here thousands of miles away, is that some of the conversations
the government may think have a scent of violence are talking
about reputational threats, not violent threats.  These are
billionaires, oligarchs who want to bet.  It's their past time.
It's even more ingrained in their culture than it is in
America.

        If they don't pay their bets, then they're shamed or,
as Mr. Tokhtakhounov said in one of these two conversations,
I'm going to put up a stink, which means they'll spread the
word that you can't trust this person.  And that's the second
conversation about a man named Roma, who, in other tapes, it
showed he was going out buying Moscow houses for 20 million
each and he was going to London for a $50 million business deal

E4ugtrins

and he wasn't paying his gambling debts.  There's discussion

there, but again no evidence, that he was ever threatened and

no evidence that he was ever harmed.  In fact, in tape 2043,

it's Roma threatening Vadim Trincher for not taking his bet,

which was discussed in a later conversation as well.

All of it is not to disregard the fact that the

government has indicted Mr. Tokhtakhounov as an independent

codefendant in Moscow, but when we're individualizing sentence,

your Honor, this is not a violent man.  He is not a man that

resorted to violence.  He's not a man who asked anyone else to

resort to violence.  And the best proof in this respect is the

government's own tape where they elected not to take a bettor

who, quote, was a complainer, according to the transcript.

I want to talk briefly about the suggestion that his

sickness should be affected by his relationship to his sons,

both of whom are in court, both of whom, whatever their

transgressions, they were not part of his bookmaking.

Mr. Trincher, on one hand, didn't accept the American

multimillionaires that played poker with Illya Trincher.  And

I'm not going to get ahead of his own sentencing arguments that

will be presented to your Honor, but most of what Illya learned

from his father, to the extent he learned gambling, it was to

be a poker player.

This man is a world-class poker player.  He's won

tournaments at Foxwood's.  He's won tournaments in Las Vegas.

E4ugtrins

1    Check the internet and what you'll see right behind this case

2    is references to the Trinchers as professional poker players.

3    Yes, Illya Trincher learned poker skills.  He also learned

4    chess skills.

5            There's a letter from Daniel's mother or from

6    Mrs. Trincher.  They both wrote letters about Vadim Trincher,

7    the father of his 12-year-old son, and how when he comes to the

8    house, they successfully integrated the families because Vadim

9    Trincher couldn't leave his house to continue to go three times

10   a week to see his son's swim meets, attend his son's classes,

11   which he did religiously according to the mother of Daniel, who

12   is also present in court.

13           But Mrs. Trincher talks about the home and all of them

14   coming together and the three chessboards at a table.  The

15   wiretaps show Illya asking his dad about a love relation and

16   his dad saying follow your heart, make your own decision.

17           You have letter after letter from some of the people

18   that are here.  Marcus Gordon is in the first row.  There are a

19   lot of people that trusted Vadim Trincher with $10 million,

20   more than most or all of them had.  He met their trust.  He

21   conformed to the conditions of bail.

22           They wrote letters to the Court.  I know the Court has

23   read them.  I'm not going to burden the Court, but there are

24   two sides to this man, neither of them are violent.  Neither of

25   them are of a sophisticated money launderer.

E4ugtrins

1        One of them is that he grew up in the world of

2   gambling and he never abandoned it, and he regrets that.  He

3   understands it's an American crime and understands he shamed

4   himself with his family and he shamed himself with his mother,

5   which hurts him to the core.

6        Another side of him is that he is a gentle mentor.  He

7   mentored other children.  You have letter after letter that he

8   didn't just throw money at charities.  He put his time, wisdom,

9   and guidance on the line.  He's a good man.

10       I ask your Honor to please consider giving him a

11  sentence at the guidelines as enhanced by the role.

12  Thirty-three to 41 months is more than sufficient.  Time in

13  jail crawls according to people that have talked about it.

14  It's a numbing experience.  That sends a message.  That's

15  sufficient deterrence and punishment, and that's certainly the

16  kind of sentence that will extinguish any risk that

17  Mr. Trincher will ever go back to the life he led.

18       Since I met him, he's been under house arrest.  He

19  wanted to learn English better.  He wanted to go to school.  He

20  wants to learn computer skills.  He wants to be a member of our

21  society.  He has the brains and the ethics to do it.  He'll

22  never be before the Court again.  Please give him a guideline

23  sentence, Judge.

24       Thank you.

25       THE COURT:  One question to you, Mr. Weinberg, before

E4ugtrins

1    you sit down.

2            I know the defendant invoked his Fifth Amendment

3    privilege with respect to providing financial information to

4    probation.

5            MR. WEINBERG:  Yes.

6            THE COURT:  Is there any dispute he would be capable

7    of paying a fine in this case?

8            MR. WEINBERG:  There is none, your Honor.

9            THE COURT:  Thank you.

10            MR. WEINBERG:  Thank you, sir.

11            MR. NAFTALIS:  Can I reply briefly on this.

12            THE COURT:  Yes.  I actually would like you to reply

13    briefly in particular to the argument that Mr. Weinberg made,

14    which was not really made yesterday, which is that this case is

15    not exceptional or out of the heartland in its scale or scope,

16    that there are other bookmaking enterprises and the like that

17    are similar or graver in size.

18            If you could address that in addition to whatever else

19    you want to respond to, go ahead.

20            MR. NAFTALIS:  Yes.  I'll start with that question.

21    To our knowledge, this is one of the biggest bookmaking

22    operations in the world.  To hear it here, it's as if we picked

23    off something on the street corner.  This is a R.I.C.O.

24    enterprise, which I think is getting lost in the guidelines

25    discussion, operated by two men affiliated with a man, one of

E4ugtrins

the highest levels of organized crime in Russia, who ran a
massive sports bar.  I don't know of any other case that's this
big.

        We're now saying that $100 million isn't a lot of
money.  I thought that was a lot of money.

        THE COURT:  Do you know anything about the cases that
Mr. Weinberg cited, because I confess, I don't know.

        MR. NAFTALIS:  I know the *Pinnacle* case.  I don't know
the scale of it honestly, but those are not R.I.C.O. cases,
which I think is what every defendant yesterday and today are
running from.  These men did not plead guilty to bookmaking.
They pled guilty to being racketeers.

        The problem we have is that the guidelines push you
down to what we think of as just bookmaking, but that is not
what your Honor is considering.  Your Honor is considering
whether two men who your Honor has found led a R.I.C.O.
enterprise, what they should be sentenced to, not what two men
who ran a book out of New York should be sentenced to.  That is
really the key question.

        I would just reiterate that's the argument we were
making in our memo, which was that the guidelines make you
forget that it's R.I.C.O. because you keep coming back to the
easiest and lowest offense.

        We don't agree that there is a real difference between
Mr. Trincher or Mr. Golubchik.  We're, obviously, up here

E4ugtrins

standing up here saying did someone have a strength?  Yes.
Mr. Trincher was just as involved in money laundering.  He's on
all of the signature cards for the bank accounts.  He is
receiving equal share, which is laundered through all of these
Cyprus shell accounts, into their hedge funds, real estate.
They're doing the exact same thing.  Maybe one of them did a
little more than the other, but again, this is a R.I.C.O. case.
They are sharing in tens and tens of millions of dollars.  The
calls make clear they are equal business partners.  He is not
Mr. Golubchik's servant.  They are equal in all respects.

        To distinguish the cases, which I confess I don't know
much about, there was no tie to organized crime.
Mr. Tokhtakhounov is a *vor*; there is no dispute.  The fact
where on one wiretap for a few months and the fact that we
don't have someone being hurt, that's always held against the
government.  But that is what his job is; that people are so
afraid to cross him, that they pay.  That is called extortion:
Threat of the use of force.

        When Mr. Trincher's home was raided by the F.B.I.,
there were tons of cell phones.  Who knows what was going on
with the other cell phones.  The argument that nothing ever
happened, we're equally in the dark.  We know the phone we were
on and we know what Mr. Tokhtakhounov's role was, which was to
get people to pay.

        These oligarchs, they came to New York to bet.  So,

E4ugtrins

this overseas fiction that's being created, yes, a lot of it is
overseas.  When they came here from Kiev, they are betting in
New York City.  They traveled internationally back and forth.
Mr. Trincher traveled internationally back and forth.  The
whole reason why they're coming here and moving their money
here is because the American banking system is safe.  That's
why they're laundering money through Cyprus to the United
States; because they're all afraid of what happens if we keep
our money in a bank in Kiev or a bank in Moscow.

They are exploiting the U.S. banking system to run an
international R.I.C.O. enterprise.  That's why the sentence
should be so high and that's why it's exceptional.  This isn't
a guy booking 20-dollar bets on the corner.  This is someone
who was affiliated with, and has pled to, being a part of a
R.I.C.O. enterprise.

The sentence for Mr. Druzhinsky, he did not plead to
being in a R.I.C.O. enterprise and he was doing much less.  He
had international clients, too.  They're on a different scale.
And there was no allegation that Mr. Druzhinsky was affiliated
with Mr. Tokhtakhounov.

The calls, to read them innocently, every defendant
comes up here and says we read these things so aggressively.
You read them and it's not just a hint.  There's the implicit
use of force that they are implying will be used.  And we have
the calls go send, I'm forgetting the names, effectively the

E4ugtrins

collectors overseas who are inheriting the reputation of

Mr. Tokhtakhounov.

Overall, they should get the same sentence, your

Honor.  Then we do believe that to the extent there is some

sort of mitigating argument, which I don't believe has any

merit, bringing your children and then recruiting them to rise

up is an aggravating factor.

All of these men, I'm sure, have wonderful families.

That's not in dispute.  The question is whether Mr. Trincher

was teaching his children to take over a massive bookmaking

operation.  And they are picking up money for each other, they

are coordinating, they are learning how to do international

bookmaking and money laundering.  So, the sentence should be

the same.  There is no difference at all.

To distinguish bookmaking from money laundering is a

vague distinction, but it also ignores the fact this is a

R.I.C.O. case and that's what I think the sentence comes down

to.

MR. WEINBERG:  May I respond for a moment.

THE COURT:  You may briefly, and then I want to give

the defendant an opportunity to be heard.

MR. WEINBERG:  Very briefly.

One is, yes, it's a R.I.C.O. case, but his end that he

managed was the bookmaking end, not the complexity of the money

laundering.  That distinguishes him from Mr. Golubchik.  It

E4ugtrins

makes him more like the *Pinnacle* billionaires that ran the

largest internet company.  They got probation in Queens.  Yes,

they were not federally charged with R.I.C.O.  It distinguishes

him from other R.I.C.O. people.

Yes, whatever Tokhtakhounov is, he never asked him to

use his organized crime influence to collect money in Kiev or

Moscow.  He's not a man of violence.  And the proof of it is

the government's own conversations that show they didn't take

bets from anyone they thought could be a problem.

Second, I would suggest a sentence more in line with

the bookmaking sentences, even with a small enhancement or the

enhancement for R.I.C.O., would be appropriate which gets

you -- we started with R.I.C.O.  It's already been included in

the plus-four role.  Thirty-three to 41 is not a bookmaker

sentence; it's a R.I.C.O. sentence, but I would contend it

should not have the enhancement for being a sophisticated money

launderer because he was a beneficiary but not the man that ran

the money laundering.

Second, I can't let the statements about his two sons

go.  The government gave you two examples.  On one, his son got

on planes in Vegas.  He had poker money that he invested in a

poker game.  Somebody won.  He got it back.  He paid one of

Illya's -- somebody said can you pay and Illya was in Los

Angeles.  He paid.  His sons are not professional bookmakers.

You'll hear about Illya and 99 percent of what he did crossed

E4ugtrins

1    over in the line.  He'll talk to you about it.  Mr. Chesnoff

2    represents him.  I'm not going to burden the Court with Illya.

3    He didn't groom people to take over his business.  That's just

4    not fair and not right.

5            In fact, Illya Trincher, 28 years old, has never been

6    to Moscow, never been to Kiev.  He didn't introduce him to his

7    childhood friends.  Illya Trincher never took a bet from the

8    people in Kiev and he never took a bet from the people that

9    Illya Trincher was playing poker with who asked Illya, hey,

10   please get a Laker game bet on.  And they bet large amounts of

11   money because they're very wealthy people.

12           It's not fair to attribute his conduct to them; and I

13   would suggest, your Honor, that it's not fair for the

14   government to argue that he's somehow grooming them to take

15   over his business.  That's completely incompatible with the

16   facts of this case.

17           THE COURT:  Thank you.

18           Mr. Trincher, is there anything that you wish to say

19   before I impose sentence?

20           THE DEFENDANT:  Your Honor, I am reading because I'm a

21   little bit nervous.  I appreciate that you let me out on the

22   bail and that you trust me, and I did not let you down.

23           I deeply sorry for my crime and will do the sentence

24   you impose.  I know the sentence may exceed my hopes.  I know

25   that Mr. Golubchik was sent to jail yesterday.  And I ask you,

E4ugtrins

1    sir, and I ask you that you trust me again and let me

2    self-surrender so I can say a proper good-bye to my --

3            THE COURT:  Take a minute Mr. Trincher, if you'd like.

4            THE DEFENDANT:  Okay.  Say good-bye to my little boy

5    and Yevgeney and Illya when they are sentenced, plus attend to

6    some needed medical issue.  That's it.

7            THE COURT:  Thank you.

8            Counsel, is there any reason that sentence should not

9    be imposed at this time?

10           MR. NAFTALIS:  No, your Honor.

11           MR. WEINBERG:  No, your Honor.

12           THE COURT:  In imposing sentence, I am required to

13    consider the factors set forth in Title 18, United States Code,

14    Section 3553(a).  These include, first, the nature and

15    circumstances of the offense and the history and

16    characteristics of the defendant; second, the need for the

17    sentence imposed to advance the purposes of sentencing, namely

18    to reflect the seriousness of the offense, to promote respect

19    for the law, and to provide just punishment for the offense, to

20    afford adequate deterrence to criminal conduct, to protect the

21    public from further crimes of the defendant, and to provide the

22    defendant with needed education or vocational training, medical

23    care or correctional treatment in the most effective manner;

24    third, the kinds of sentences available; fourth, the guidelines

25    range, which I have found to be 33 to 41 months' imprisonment;

E4ugtrins

1    fifth, any pertinent policy statement; sixth, the need to avoid

2    unwarranted sentencing disparities among defendants with

3    similar records who have been found guilty of similar conduct;

4    and seventh, the need to provide restitution to any victims of

5    the offense.

6          Ultimately, I am required to impose a sentence that is

7    sufficient, but no greater than necessary, to comply with the

8    purposes of sentencing that I mentioned a moment ago.

9          Needless to say, I have given a lot of thought and

10   attention to the appropriate sentence to impose in this case as

11   I did in Mr. Golubchik's case yesterday, as I have for every

12   defendant I have sentenced thus far in this case.

13         I will confess that I found Mr. Weinberg's arguments

14   with respect to a departure or variance more effective than the

15   arguments that were made to me yesterday.  I will concede that.

16   But nevertheless, I do think, as I did yesterday and as I

17   articulated yesterday, that an upward departure and in the

18   alternative, an upward variance is appropriate here.

19         The bottom line is that the defendant pleaded guilty

20   to racketeering and money laundering and whether he was the

21   central figure in that money laundering or not, his involvement

22   in it is not disputed and is not minimal.  The scale, nature

23   and scope of that conduct is just not something, given the way

24   the guidelines work, that I think is taken into consideration

25   in the guidelines range, which is to say, for the reasons that

E4ugtrins

1    I stated yesterday, that there are some anomalies here and

2    whether that is a problem with the gambling provision, 2E3.1,

3    or the money laundering provision, 2S1.1, by delinking

4    completely the amount of money involved from the calculation of

5    the guidelines, I think the commission failed to distinguish

6    among different gradations or different enterprises or money

7    laundering enterprises of different scales.

8            I think the anomalies are highlighted or exemplified

9    in the calculation of Mr. Azen's guidelines which were higher

10   than the calculation of Mr. Trincher's and Mr. Golubchik's,

11   even though the amount of money he was involved in laundering

12   was substantially less, namely 200- to $400,000, versus the 50-

13   to $100 million range that is at issue here.

14           Again, the bottom line is that when push comes to

15   shove, I don't think that the guidelines adequately take into

16   consideration the scale of these sorts of operations; and

17   again, whether that is a problem with the gambling provision,

18   the money laundering provision, the racketeering provision or

19   the combination thereof, I do think that this case presents

20   aggravating circumstances of a kind, or to a degree, that are

21   not adequately taken into consideration by the sentencing

22   commission.

23           To put it differently, this conduct in this case

24   distinguishing Mr. Trincher from the heartland of cases,

25   including many of the other defendants that I have seen in this

E4ugtrins

1    case.

2        When push comes to shove, I cannot bring myself to

3    impose a different sentence on Mr. Trincher than I imposed on

4    Mr. Golubchik.  From everything I have heard, and I hear that

5    he may have played a different role and been a less

6    sophisticated partner on the money laundering piece of this, it

7    just does not seem to me that there is a meaningful distinction

8    between the two, given the nature of the criminal conduct here

9    and its scope, scale, sophistication and the like.

10        Any claim that Mr. Trincher thought that what he was

11    doing might have been legal, that he was only engaging in bets

12    outside of the United States and the like is belied by the

13    nature and extent of the money laundering here, which, again,

14    whether he was in charge of it or not, he certainly was heavily

15    involved in it; and whether or not there is any evidence that

16    Mr. Trincher himself was involved in or knew of any specific

17    threats, the specter of violence was, I believe, present in

18    this case as the two calls referenced in the government's

19    submission and the mere fact that Mr. Tokhtakhounov and his

20    status as a *vor* and his involvement in this case make clear.

21        Again, when push comes to shove, I just don't see any

22    meaningful distinction to be drawn between Mr. Golubchik who I

23    sentenced yesterday and Mr. Trincher who sits before me today.

24        Having said that, I will now state the sentence that I

25    intend to impose.  Mr. Trincher, would you please rise.

E4ugtrins

1          It is the judgment of this Court, Mr. Trincher, that

2    you are remanded to the custody of the Bureau of Prisons for a

3    period of 60 months, that is five years, to be followed by a

4    period of three years of supervised release.

5          During your term of supervised release, you will be

6    subject to the following mandatory conditions:  You shall not

7    commit another federal, state or local crime.  You shall not

8    illegally possess a controlled substance.  You shall not

9    possess a firearm or destructive device.  You shall refrain

10   from any unlawful use of a controlled substance and submit to

11   one drug test within 15 days of your release on supervised

12   release and at least two periodic drug tests thereafter as

13   determined by probation.  You shall cooperate in the collection

14   of DNA as directed by probation.

15         In addition, the standard conditions of supervised

16   release shall apply, and you must also meet the following

17   special conditions:  First, you shall submit your person,

18   residence, place of business, vehicle or any other premises

19   under your control to a search on the basis that the probation

20   officer has reasonable belief that contraband or evidence of a

21   violation of the conditions of release may be found.

22         The search must be conducted at a reasonable time and

23   in a reasonable manner.  Failure to submit to such a search may

24   be grounds for revocation.  You shall inform any other

25   residents that the premises may be subject to search pursuant

E4ugtrins

1    to this condition.

2              You shall participate in an alcohol treatment program

3    approved by the United States Probation Department, which

4    program may include testing to determine whether you have

5    reverted to the use of alcohol.

6              I authorize the release of available alcohol treatment

7    evaluations and reports to the substance abuse treatment

8    provider as approved by the probation officer.  You shall be

9    required to contribute to the costs of services rendered; that

10   is, to make a copayment in an amount determined by the

11   probation officer based on your ability to pay or the

12   availability of third-party payment.

13             You shall provide the probation officer with access to

14   any requested financial information if you have not satisfied

15   your fine, forfeiture obligations or special assessment, which

16   I will mention in a moment.  You shall not incur new credit

17   charges or open additional lines of credit without the approval

18   of the probation officer unless you have satisfied your

19   financial obligations.

20             You are to report to the nearest probation office

21   within 72 hours of your release from custody and you shall be

22   supervised in the district of your residence.  I also order you

23   to pay a fine in the amount of $75,000 which shall be payable

24   within 30 days of the entry of judgment.  I'm also imposing the

25   mandatory special assessment of $100, which shall be due and

E4ugtrins

1    payable immediately.

2          I also find that pursuant to the terms of my order

3    entered November 14, 2013, you are to forfeit to the United

4    States the property specified in that order which represents

5    the proceeds that you obtained directly or indirectly as a

6    result of or used to facilitate your criminal activity.  That

7    obligation shall be joint and several with those of your

8    codefendants.

9          Again, the record should reflect that I would have

10   imposed the same sentence whether a departure applied under

11   5K2.0 based on my authority and discretion under Section

12   3553(a).

13         Does either counsel know of any legal reason, other

14   than those already argued, why this sentence should not be

15   imposed as stated?

16         Mr. Weinberg.

17         MR. WEINBERG:  No, your Honor.

18         THE COURT:  Mr. Naftalis.

19         MR. NAFTALIS:  No, your Honor.

20         THE COURT:  The sentence as stated is imposed.

21         I find that sentence is sufficient, but no greater

22   than necessary, to satisfy the sentencing purposes set forth in

23   Section 3553(a)(2), including the need to promote respect for

24   the law, to provide just punishment for the offense, to afford

25   adequate deterrence to Mr. Trincher and to others, and to

E4ugtrins

1    protect the public from further crimes of the defendant.

2          I should note that I neglected to include in my

3    articulation of why I think a similar sentence is warranted to

4    the extent that Mr. Trincher is distinguishable from

5    Mr. Golubchik, I do think and agree with the government that

6    the involvement of his children in similar conduct is a

7    relevant and aggravating factor to be considered here.  That is

8    not to say that I accept the argument or view him as having

9    groomed them to take over his actual operation, but it is not a

10   coincidence, I imagine, that his two children are charged in

11   this case with having engaged in very similar conduct to which

12   Mr. Trincher himself has pleaded guilty.  I think that is a

13   relevant factor in crafting and imposing a sentence.

14         Mr. Weinberg, do you have any requests with respect to

15   designation or the like?

16         MR. WEINBERG:  First, I want to make sure I have

17   protected the record in terms of the arguments that I made to

18   your Honor ranging from the legal arguments, which are fairness

19   and consistency and the kind of due process, *ex post facto*

20   considerations that are not strictly applicable because we are

21   dealing with guidelines not law; and the argument that this is

22   not outside the heartland; that the government has failed to

23   give your Honor a sufficient basis to show this is an

24   exceptional set of aggravating circumstances; and that the

25   guideline commission has considered and has rejected the volume

E4ugtrins

1    or the magnitude as being an appropriate factor for sentencing,

2    as well as my objections to role.

3         In terms of requests, first, I would request, as

4    Mr. Golubchik did, the recommendation of an RDAP program.

5    That's supported by paragraph 68 of the presentence report that

6    shows Mr. Trincher has had difficulties with alcohol and that

7    he would benefit from the Bureau of Prisons' RDAP program.

8    That would be my first request.

9         My second request would be for the Court to make a

10   finding, because this deeply influences his eligibility for

11   both camps and programs, and one of the things I'd like him to

12   do is to learn English and develop skills and not just be

13   warehoused during the next years.

14        I ask you to make a finding that whatever else the

15   R.I.C.O. is charged with and codefendants were charged with,

16   there is no evidence that he personally engaged in offense

17   conduct that involved the use of force, threats, violence.  I

18   don't think the record supports that he used violence, that he

19   made threats.  And it will be of enormous importance to him

20   given the allegations about others for the Bureau of Prisons to

21   know that factually the Court did not find that he was a

22   violent person who engaged in force or threats of violence.

23        Third, I would ask for a recommendation to a northeast

24   camp with an RDAP Program.

25        Fourth, I would ask your Honor not to remand him.  I

E4ugtrins

think there is a principled distinction which is that he walked

into court today having full awareness that it was highly,

highly likely that despite whatever eloquent arguments I can

make to your Honor that you were going to probably impose the

same sentence because of the importance of disparity and the

importance of proportionality.

With Mr. Golubchik, we knew the government's

recommendation.  We knew the government would recommend remand,

but there's no reason to remand him, Judge.  He's not a flight

risk.  You have a $10 million bond cosigned by everybody out

there, his family, his friends.  He's not a flight risk.

He's demonstrated for two years -- there's not a shred

of evidence they have the right to monitor his phones that he's

been engaged in any wrongdoing.  There's no danger.  He's the

same man today that he was two days ago, except if I can

respectfully contend he has proven that he is going to meet

whatever obligations he has to the Court.

That was something that Mr. Golubchik couldn't prove

because he walked in thinking he was getting a guidelines

sentence and your Honor made a decision that disappointed him,

but Mr. Trincher is here.  He'll meet any conditions your Honor

sets.

He's got, in addition, several outstanding medical

issues.  He's got a dental issue.  Last night pretrial services

allowed him to go to Queens and deal with his dental problems

E4ugtrins

1    and, of course, he came back as he promised.  The dentist

2    started to fix loose teeth but needs time to finish the work.

3    A letter was faxed, I hope not inappropriately, at probably

4    10:30 this morning to your Honor's chambers dealing with the

5    outstanding dental issues.

6         He's got an acute abdomen pain where the doctor is

7    saying he is on medication and undergoing diagnosis.  They

8    still have not found the exact cause of it.  It's really

9    important when people go to jail for five years they have their

10    dental and medical problems under control.

11         Lastly, he wants to be here, even if not in court,

12    then at home when his two sons are being sentenced.  And he

13    feels a sense of deep responsibility for whatever part of their

14    problems he caused.  He'd like to be there for them.  He's a

15    good father.  He'd like to be there and have some final time

16    with the 12-year-old that's going to miss him deeply for three

17    our four years while he's in the custody of the Bureau of

18    Prisons.

19         He's not blaming anybody, but there's no need to

20    remand him, Judge, and there is a principled basis to allow him

21    60 days out.

22         Thank you, sir.

23         THE COURT:  Let me say a few things at the outset.

24    One, you have made your record and to the extent that you have

25    preserved issues for appeal, they are preserved.

E4ugtrins

1          You made reference to *ex post facto*.  I confess I

2     don't know what you're talking about on that score unless it is

3     a loose term for the argument that this is not something that

4     the defendant expected in pleading guilty pursuant to the

5     agreement that he did.

6          I don't think there's any *ex post facto* argument

7     within the technical meaning of that term in the Constitution.

8          MR. WEINBERG:  I agree.  I'm talking about the kind of

9     values that they protect a citizen who believes at the time of

10    an offense, that there is a law that sets a certain punishment,

11    that part of the reason I believe your Honor enhanced it is

12    that your Honor, for principled reasons, has determined that

13    the existing guidelines do not match a factor and falls

14    somewhere in the void between these three factors.  It's not

15    just the aggravation of the facts, but it's also that the

16    guidelines, in your Honor's judgment -- and I believe that if

17    you went before other judges, they would have a different

18    judgment about the adequacy of these guidelines that are in

19    effect so long.

20         It's not that he's entitled by some legislative action

21    after the fact to the full implications of *ex post facto*

22    protection; it's more the arguments about predictability and

23    consistency and that citizens should get what they expected or

24    what the law suggests they should expect.

25         Yes, this is 3553.  Yes, it's advisory.  I don't make

E4ugtrins

  1    a complete unconditional *ex post facto* argument.  I do say that

  2    some of the values implicated are relevant in terms of the

  3    enhancement of the guidelines here, your Honor.

  4            THE COURT:  Again, you have made your record.  I'm not

  5    aware of any *ex post facto* restriction on a Court exercising

  6    its discretion to craft an appropriate sentence within the

  7    statutory maximum and consistent with the law, but, again, you

  8    have made your record.

  9            I will recommend that the Bureau of Prisons consider

 10    Mr. Trincher for the RDAP program, assuming that he is eligible

 11    based on his recent history of the use of alcohol.

 12            With respect to the issue of threats, I'm certainly

 13    prepared to say that I have not seen any evidence tying

 14    Mr. Trincher directly to any particular threats or the use of

 15    violence, but I think I made my record earlier that I think the

 16    racketeering enterprise as a whole is certainly linked to, at a

 17    minimum, the specter of violence, if only through the person in

 18    the position of Tokhtakhounov.  To the extent that Mr. Trincher

 19    allied himself and affiliated himself with Tokhtakhounov, then

 20    he is connected to it.

 21            But again, I certainly have not seen any evidence that

 22    Mr. Trincher himself has exercised any violence or used any

 23    threats of violence himself.

 24            MR. WEINBERG:  Thank you, sir.

 25            THE COURT:  I will recommend that he be designated to

E4ugtrins

1    a facility in the northeast, as close as possible to New York,

2    to facilitate the maintenance of ties to his family.

3              On the question of remand, Mr. Naftalis, do you wish

4    to be heard on that question?

5              In particular, I think Mr. Weinberg makes a reasonably

6    compelling point that Mr. Trincher is distinguishable from

7    Mr. Golubchik in the sense that he showed up today having a

8    pretty good sense of what might be coming down for him.

9              Could you address that issue.

10             MR. NAFTALIS:  Your Honor, we think remand is

11   appropriate.  I don't see him as any different from

12   Mr. Golubchik.  The fact that you may have a better sense as to

13   what your sentence will be -- they both knew they were going to

14   jail and they both showed up.

15             The fact that you have a better sense that it's

16   longer, I understand the argument.  I'm not going to say it.

17   He's certainly less of a risk of flight, but I don't think it

18   means he should not be remanded.

19             I don't think the medical issue -- honestly, he's been

20   out for a year.  Every defendant has medical issues before they

21   go in.  When they know they're going in, they should deal with

22   them; and if not, the Bureau of Prisons is more than capable of

23   dealing with what sounds like relatively minor issues.

24             I don't think showing up for court necessarily means

25   you don't go in.  That's what it comes down to.  Mr. Golubchik

E4ugtrins

1    showed up, too.

2            THE COURT:  I have to say I think that is a close

3    call.  I do think that Mr. Weinberg's argument gives me pause.

4    I think, upon reflection, I don't see any reason to delay

5    remand, and I don't think that the medical reasons warrant

6    delaying remand.

7            I will therefore order that the defendant be remanded

8    to the custody of the United States Marshal.

9            MR. WEINBERG:  Could I ask your Honor to reconsider

10   that decision at least for a short period, a two-week period,

11   where he would be able to resolve these dental issues and

12   finish his medical treatment.

13           Going to jail and trusting BOP dentists is not a good

14   thing.  He's not a flight risk.  We're not asking any longer

15   for the 60 days that others have gotten.

16           THE COURT:  Mr. Weinberg, I have made my ruling.  The

17   answer is no.

18           MR. WEINBERG:  Can I make one last request:  Let him

19   surrender at 3:00 today.  The act of surrendering rather than

20   being locked up gives you all kinds of security level

21   reductions.

22           THE COURT:  Mr. Weinberg, I have made my ruling.

23           The marshal is directed to take the defendant into

24   custody.  I assume that the marshal will coordinate with

25   pretrial to remove the ankle bracelet if that's an issue here,

E4ugtrins

1      as well.

2             Is there a motion with respect to other counts?

3             MR. NAFTALIS:  Yes.  The government moves to dismiss

4      all open counts.

5             THE COURT:  All counts other than Count One with

6      respect to Mr. Trincher are dismissed.

7             Mr. Trincher, to the extent you have not given up your

8      right to appeal, your conviction and sentence through the plea

9      of guilty and the agreement that you entered into with the

10     government, you have the right to appeal.

11            If you cannot afford to pay the costs of an appeal,

12     you may apply for leave to appeal *in forma pauperis.*  Any

13     notice of appeal must be filed within 14 days of entry of the

14     judgment of conviction.

15            Is there anything further, Mr. Naftalis?

16            MR. NAFTALIS:  No, your Honor.  Thank you.

17            THE COURT:  Mr. Weinberg.

18            MR. WEINBERG:  No, your Honor.

19            THE COURT:  We are adjourned.  Thank you.

20            (Adjourned)

21

22

23

24

25